Good morning, Your Honors. May it please the Court, Michael Snodgatt Duran on behalf of Petitioner Duran. Mr. Duran was on trial for murder. During deliberations, after two and a half days of deliberations, the jury was deadlocked, initially 10 to 2 and then 11 to 1, between murder and something less than presumably manslaughter. At that point, one of the majority jurors gave the holdout jury an article. At that point, there are two breaks in which this happened, correct? Could have happened. Could have happened, that's right. Do we know, does the record reflect at all which break the parade article came before the jury? The record below neither in the state court or federal court indicates that, Your Honors. Well, the first break really wasn't a break, was it? Well, it was a – I'm talking about the first break was clearly a break, the afternoon break where there was a note and then instructions. And then later, a recess for the day. Well, the question is, I mean, do we know, do we know at what point in the deliberation that Judge Fischer says this information came to the attention of the jurors? Well, we know it was either towards the end of the third day deliberations or right in the middle of the fourth day, just before they returned the verdict. It would be one of those two points. It had to be one of those two points because those were the only two points where there were breaks after the announcement of the deadlock. Well, what happened between the first – let's say they are both breaks. What happened between break number one and break number two? Wasn't there instructions from the jury, from the court? That's correct, Your Honor. The court did instruct the jury on a number of – So let's assume that the juror got it during the first break. Before the first instruction. Before the instruction. That's right. And then what we have is that now the court gives an instruction and then the jury goes back and there is this quick turnaround verdict. What, sitting in our position, are we supposed to infer in terms of the reasonableness of the State court's conclusions that that was not the probative of prejudice, of the juror switching his or her mind, I guess? I don't know if Lauren is a male or female. Yeah. Well, it's a – he's a male. But what this Court has before it that shows that it was the article and not something else, I suppose one inference might be that it was the court's re-instruction that prompted his change of mind. It's basically just the nature of the article and the timing of it. Well, that's the critical thing, the timing. In other words, if the article came to that juror's attention before the re-instruction and then the re-instruction followed by the verdict, doesn't that change the analysis? It certainly weakens analysis. I'm not sure that it necessarily is favorable analysis, though, given the nature of the article. There are other cases. One case is actually cited by the Massachusetts Report and Recommendation where the court had instructed on malice and the extrinsic evidence was a dictionary definition of malice. And the State's argument in that case was that, well, this was just merely supplemental. But this Court nonetheless found that the extrinsic evidence had a impact on the juror's verdict. Likewise here, at best, they created not even a conflict, but there are more in the terms of the court's instruction with respect to the juror maintaining his position could be viewed as merely supplemental to the instruction that the juror had gotten from the holdup, from the majority juror in attempting to force the verdict. That is, that his position was irrational and that it was intrinsically irrational because any time that the jury is deadlocked 11 to 1, by definition, the minority juror is the one who is to blame.  We're trying to make sure that the jury is not irrational in the face of overwhelming guilt. No. Kennedy. Don't you have to show here that the error meets the Brecht standard? That's correct, Your Honor. How do we determine that if we don't know when it happened? Well, we know it happened. We don't know when. Well, we know it happened at one or two points. Then the question is whether or not the analysis, if not different, at least greatly amended by the question of whether it came before or after the trial court's re-instruction. Certainly, the case is stronger if it came after the court's re-instruction than if it was before. But as I just suggested before, that's not necessarily failure to claim that there's no Brecht error, that the standard doesn't meet the Brecht standard. But then you're faced with the standing presumption that jurors follow instructions. And here they got an instruction on what to do that covered much of the same things as the parade article. It covered much of the same thing, but it was at odds with the parade article. Right. So they follow the instruction. They're not instructed to follow the parade article, which the superior court judge knew nothing about. At the time of instruction, of course. Right. Now, I admit that certainly if we can assume that the juror followed that instruction, then that would, if not mitigate the error, at least lessen the error. But there's no way of knowing that. And the article itself was so prejudicial that it's not clear that the re-instruction would have addressed that in any case. The article was much, much stronger than the judge's relatively neutral comments regarding that. And the re-instruction did caution a juror that they should change their mind if it was based on something that was irrational. So presumably dovetailing with that, Judge Rothrax had said that by definition you're irrational when you're in the minority. And again, this was not, even though the State court characterized it as one, it was not an overwhelming case of murder. I mean, it was an overwhelming case of guilt, but it was an overwhelming case of murder. Critical questions is between murder and manslaughter. And there was very much evidence that this could have been something less than murder manslaughter based, one, on the man's admitted and undisputed intoxication, and two, the uncontradicted evidence of his upbringing in that he witnessed these horrific things that had, that had spread a stress disorder in him that made him more susceptible to threats. And under California law, an honest, though unreasonable belief in the need for self-defense would be sufficient to trigger manslaughter. And that's what the defense was here. So even though the State court characterized it as overwhelming evidence, the evidence was far from overwhelming. And given that, given the nature of the error, the State court's dismissal of Precious Prawn was unreasonable. Good morning, Your Honors. Deputy Attorney General Randall Einhorn on behalf of Respondent Appellee. The trial, the district court here correctly concluded that the State court reasonably found there was no prejudicial jury misconduct. As the court mentioned shortly ago, the court, the jury was re-instructed in this matter, and those re-instructions included the burden of proof. Each juror is entitled to their own individual opinion and shouldn't be swayed, et cetera. And as a matter of fact the one that that take place, the re-instruction? The re-instruction was at the end of, the end of the day, right before they broke, I believe it was on day two. I believe this was two and a half days of deliberation. At the afternoon of day two, they were re-instructed. They deliberated the morning of the third day and came back with a verdict around lunchtime, I believe. And as the court earlier mentioned again, that this court does have to presume that the jury followed the instructions. And as the report recommendation from the district court talked about, that it, the evidence strongly did indicate that the re-instruction did assist the jury. I might also point out that, aside from any. But the presumption would be overcome, don't you think, if in fact the parade article was introduced to the jury after that instruction? No, I don't believe that, Your Honor. I think perhaps if there was a scenario where the. That's a clear violation of the instruction, isn't it? The introduction of the article is a clear violation? Well, I don't know if the instructions reference anything specifically along that line. It said no extraneous sources. You're not to consider any extraneous sources. Well, I think this case, it's sort of a fine line whether this is an extraneous source. All the cases that talk about extraneous information introduced to a jury all deal with matters that are specific to that trial, specific to the defendant. Pertaining to that case. Pertaining to that case. I'm not aware of any case that's been cited anywhere where a, some sort of a generalized article. Well, wait a minute. I think I've seen cases, for instance, that involve a juror consulting a dictionary. Well, true. Looking up, yeah, I believe those cases are consulting a dictionary to look up the definition of a term that is specifically. I can't remember what the term is, but that is part of a jury instruction that the jury is deliberating on. And oftentimes those, that definition is discussed by the whole jury. But in this case, the parallel to that, the analogy, albeit just an analogy, would be in this case, the dynamic of the jury is precisely what the Rothwax article deals with. The sole holdout. So in that sense, the extraneous material isn't just a generalized statement. It also includes that fairly directly applicable passage that relates to holdout, doesn't it? Well, it does, as well as a whole bunch of other concepts and various high-profile cases and the like. You know, I would suggest that there's no showing of any kind of discussion of this article. And there's been much more egregious cases, if you will, where 10 of the 12 jurors discussed an article by the presiding judge and they found no prejudicial error. In Mancuso, where the jury discussed specific extrinsic evidence and the court still found there was no prejudice. I mean, this is far different in terms of the article not at all addressing the defendant here, nor the law specific to the case, nor any indication of any discussion amongst the jurors. And once again, we don't know how long before they reached a verdict that this article was submitted. I might also point out, as the prosecutor below did, that the jurors were never admonished. They couldn't read the newspaper, and who knows what articles on the criminal justice system were out there during this time. The report and recommendation itself said, not even looking at the other strong evidence, the prosecution's case, the R&R said in Appellant's excerpts of record on 150 note 14, merely looking at the article itself, there was no prejudice. That this would not be considered evidence considered by the jury without an opportunity for confrontation. As did the trial court found that, and I would talk about it in some of the briefing, that the trial judge is in the best position to determine any alleged impact of any juror misconduct issues. May I have one moment? So it's your thought that if the trial judge did not instruct the jury not to read the newspaper, if all of the jurors had read this article, which was in their newspaper, let's say, that that would not have been a problem? They simply read it?  Yes. There would only be discussion that was a problem? Well, that's getting into a grayer area, certainly. If they all discussed the issue, I suppose it depends on what was said. But, I mean, it's likely that there's various articles out there in the criminal justice system. So simply reading it, no, I don't think there would have been misconduct at all. I mean, I think where we crossed here is, you know, a juror handing it to another juror. And the article was, in part, directed at what that juror was doing, which was holding out. So is that the sensitive part of this article in this case? Yeah, I think it originally, in some of the briefing, counsel had mentioned earlier on, it also talked about the fact that before going to trial, defendants go to a prelim where it's found that there's probable cause, and how that there's been various findings of likelihood of guilt throughout the legal process. I think he focused on that one as well, as well as some advocation for perhaps less than unanimous juries. Well, some. He says, by allowing verdicts to be decided by a vote of 11 to 1 or 10 to 2, Rothweck says there would be a reduced risk that a single juror could cause a retrial or force a compromise in the face of overwhelming evidence of guilt. Having cited an example where there was a clear evidence in a murder case of guilt, and one person hung because she thought the guy was too good-looking to have committed the crime. That's certainly the most relevant portion here. Again, I would submit that there's no case here that I'm aware of that anything that's that removed, and I know there's some discussion about how removed from the instant case it is, that anywhere close to that removed has been found to be prejudicial misconduct. And the district court, even assuming misconduct, found there was no prejudice based on the nature of the evidence. The district court agreed with that contention and said we don't even have to look at necessarily the overwhelming evidence because just based on the nature of the article itself, it wasn't extrinsic evidence specific to this case. I would submit thus, as the district court found, even assuming there was misconduct, Duran has not shown that there has been a substantial injurious effect. I said that the court, the California court, found that there was no prejudice. What standard of review were they using on that? They don't cite Chapman, and they frame it as reasonable probability. They don't. All I can refer to the court, I know in the ---- More like a Brecht standard than a ---- It is similar. So the standard actually on that issue that was cited in the briefing in State court was under assuming misconduct, it must be determined if there was a substantial likelihood that it influenced the juror. That's the California Supreme cases of Marshall, 50 Cal 3rd, 950, and the California Supreme case of Miranda at 44 Cal 3rd. It seems to be a similar sense to a Brecht type of standard. If that's true, then that's the wrong standard because the California court is supposed to be applying Chapman, not Brecht. Brecht is a looser standard, or a stricter standard of prejudice. So the defendant would have to show more, shouldn't have to show more at the State court review. Isn't that right? True, but I'm not sure. In rereading the briefs, I looked at that again to see what the standard is, and it was the California Supreme Court case law on dealing with juror misconduct is that language of substantial likelihood that it influenced the juror rather than a Chapman standard based on those two, the Marshall and Miranda. So if that's true, is that permissible, constitutionally permissible? Aren't they supposed to apply a Chapman standard? I'm not sure about that, Your Honor. Well, okay. So if they aren't, then what weight can we give to the finding of no prejudice? Well, I would just say that here the district court did its analysis under Brecht, which is the standard. That's us. Right. That's what we do. But the question is what deference, then, do we give to the State court on its finding of no prejudice? It seems to me we'd be basically rendering Chapman a nullity by saying it doesn't make any difference what they do as long as they say no prejudice. We can't, applying Brecht in our own review, find prejudice ourselves. But I don't think we – maybe that's how Brecht works, but in any event, I have a little trouble saying we should then defer or give any weight to the State court's finding of no prejudice if they're not evaluating prejudice under the proper constitutional standard. Well, I guess I can only say that as the district court here found that they just – that it wasn't – in reviewing what the State court did, it wasn't a reasonable application of any United States Supreme Court precedent. And I don't really – It would be if it's following Chapman. All right. Thank you. Thank you very much. Rebuttal. Two quick points, Your Honor. One with respect to the discussion just now regarding prejudice. I think this Court is clearly not required to give any deference to any prejudice finding by the State court. And that's clear. The deference to the State court is built into Brecht. And the Baines v. Canberra decision of this Court lays that out. By applying the Brecht standard, you give the State court deference on the prejudice issue, all the deference that's due. The second point I'd like to make with respect to the nature of this extrinsic evidence counsel for the State pointed out that this was more generalized. It wasn't your classic evidence related to a specific case. And while that may be true, that does not advance this argument. The problem with this is, although it was general to juries in the criminal justice system, it was specific to this particular juror in the context of this particular case. In that respect, it's more analogous to an improper Allen charge in that it was directed to a sole holdout juror whose identity was known. Everyone knew who this person was. So the purpose was to influence this particular juror. So in that respect, it's a much more egregious type there than just generalized type evidence, because now we're trying to influence a particular juror. And that was the problem in this case. All right. Thank you. We thank both counsel. Case is submitted for decision. Our next case on the argument calendar is Rodriguez v. Ayer, New Zealand. Thank you.
judges: T.G. Nelson, Tashima, Fisher